It would be Mr. McClellan. Is that correct? That's correct, Your Honor. Sean McClellan on behalf of Appellant James Magee. And if I could, I'll try and save four minutes for rebuttal, and I'll watch my time. Thank you. May it please the Court. In this case, Mr. Magee was subject to a trial that was riddled with evidentiary errors and a sentencing that failed to comply with due process requirements and committed some independent errors as well. Mindful of the Court's focus letter, I'll touch first on the Montoya issue just briefly, because the government has informed me that it intends to agree that remand for resentencing is appropriate. And that's correct. Under Montoya, either oral pronouncement of the discretionary conditions or reference back to a form that had been provided the defendant needs to happen for the discretionary conditions to be effectively orally pronounced. Neither of those things happened here. As a result, at a minimum, remand for those sentencing conditions, discretionary conditions. So they're conceding it? That's my understanding, Your Honor. I believe the government can address that further. Well, just because they're conceding it, having been a trial judge and sentenced a lot of people, it seems like you're looking for magic words. But I'm not sure, and it seems like there was a pretty definite— I'm not sure I agree with that, but I'm not sure I would fight that. I have a factual question about that. As I understand it, the standard conditions were listed in the pre-sentencing report. Am I wrong about that? I don't believe that's correct, Your Honor. The pre-sentence investigation report referred to generically the standard conditions but did not specifically list the standard conditions. So it doesn't comply with Montoya's possible reference back exception. And the standard discretionary conditions were not orally pronounced at sentencing either. So under Montoya— Well, I knew that part. I wasn't positive about the other. Thank you. I actually had a question about the exact language because this issue is going— the Montoya issue is just coming up all the time now. So the PSR said, quote, recommended by the Sentencing Commission, end quote. What is that? I wasn't sure what that was referring to. Is there something in the sentencing guidelines that specifically lays that out? I wasn't aware what that was. Yeah, so this is basically the Montoya problem, and that's why the reference, the generic reference to standard conditions, doesn't cut it under Montoya because we actually don't know specifically— Well, I agree with you on the Montoya issue, so I'm there. But I just want to know for a future, if this comes up again, where do you look to to find the standard conditions recommended by the Sentencing Commission? Is there a listing? Is there a document somewhere? Because this issue is going to keep coming up, and I would just like to know, actually. Understood, Your Honor. You know, I think the standard conditions are— well, some conditions are discussed in the sentencing guideline manual, but we don't know exactly what the probation office is necessarily referring to. And we certainly don't on this record. But I would suppose it is generically referring to conditions discussed in the sentencing guidelines. But I don't even recall in the sentencing guidelines where it says what the standard conditions are. That was my confusion. And I don't either, Your Honor. I don't recall specifically where in the sentencing guidelines manual they would have even referred to standard conditions. Uh-huh. Because that's more about length of time, whether you get probation or home confinement and how you calculate the amount of time. I don't recall seeing anything laying out in the U.S. sentencing guidelines, the standard conditions. And I don't recall— Okay, maybe the government can help with that. So are you saying that there was reference to a part? Are you saying in the part that was referenced the standard conditions were not listed? That's correct, Your Honor. In the Precincts Investigation Report, it's a reference to generically standard conditions. Montoya requires if you're going to go that route on the reference back, those standard conditions needing to be listed out in a form or orally pronounced at sentencing. Neither of which I recall. Or, no, there could be a document that lists them that is incorporated by reference. You would concede that, right? Yes, Your Honor. But that was not provided in the government's report. Right. Here, I don't know what standard conditions recommended by the Sentencing Commission means. Agreed, Your Honor. And so remand under Montoya is appropriate. Okay. To address the other issues that the Court identified in its focus letter, I'll touch first on Brady and then turn to the handwriting issue with respect to Agent Williams' testimony. So with respect to Brady, we're looking at the framework for Brady violations laid out by this Court's case in Price, where there's favorable information that was not provided. Let me cut to the chase on this one. As I understand it, the claim is that the failure to reveal that a person who copied a license at the post office in 2015 was white. Is that the correct focus of your claim? That's correct, Your Honor. What I have difficulty understanding is how that is relevant. It's undisputed that your client didn't work at the post office then, and nobody's ever claimed that he copied the license. And the fact that one person copied something a while ago just seems totally irrelevant. I don't understand how it's exculpatory. So a couple of thoughts, Your Honor. One, it's not undisputed as to my client's employment at the post office at the time. The record is actually unclear. The government didn't prove one way or the other whether he was working there at the time. But more broadly, we're dealing with the suppression of what's effectively an alternate suspect, and that's a problem under Jernigan, which is— There's another question I have, too. It's not clear to me that the prosecutor knew this information. And if I'm wrong about that, I'd appreciate your letting me know. But if the prosecutor didn't know, that seems to be another potential issue for your claim. So the knowledge of the agent alone is sufficient for Brady issues under this court's cases, including, for instance, Price. But more broadly, we're, again, dealing with the suppression of a possible alternate suspect. Well, except also two. But the evidence actually, just so that we have the record correct, the evidence actually came in about— The woman that—I'm spacing on her name right now. But she said, I think I gave my witness to a white person. All right. Then that came in at trial, and also the agent said something like, well, was equivocal about maybe she did say that. I don't know. And so all of that came in. But then what—the prosecution didn't use that license for anything. And then I think the district court, if I'm not mistaken, said, okay, I'm just going to assume—they're going to get you over the first step. I'm going to assume it, but say it's just not prejudicial. It all came in. And your client, they have the video, and it shows your client selling the money order to the alleged— I think the first name starts with A, if I'm not mistaken, the woman that bought the money order. So I kind of share Judge Graber's, what does it matter? The license could have gotten there anyway, and no one ever— I know you're kind of going for the, is it some other dude did it? You know, that somehow a white person sold the money order. But you've got—but your client's right on the video selling the money order to this person. So I think the court's questions go largely to the prejudice question here. And the late disclosure undeniably prejudiced the defense in a number of different ways. One, had we had this information prior to trial, could have investigated and found a possible white suspect who got the driver's license that resulted ultimately in the number on the back of Ms. Dragulescu's money orders? Well, are we bound by the district court assuming relevance? If we don't think it was even relevant, then it's over? We're not bound by that, right? We look at it de novo, correct? The court can review the full record, but even reviewing the full record, the district court is correct that this is possibly favorable information to the defense because this is a key component of the alleged completion of this crime. Putting the driver's license information on the back of the money order is critical to getting the money. And so as a result, an individual who took the driver's license, even if it was a period of time before, is a very strong alternative suspect. Gives us a third-party culpability defense that we didn't have before this late disclosure of the information. We would have conducted a defense investigation, done different voir dire questions. What is your answer to the prejudice question? You have the victim identifying him. As Judge Callahan says, you've got surveillance photos, videos. You've got the pay stub of one of the money orders in his car. The evidence seems overwhelming. And then you have them selling the $1 money orders. Then you have deposits in the Navy credit union. You've got the transaction records showing they're all to Clark 12. I mean, what is the response to that, even if you had been able to conduct this additional investigation? There was quite a bit of evidence in the record calling into doubt the accuracy of the timestamps. We had a standalone timestamp video argument. There's quite a bit of evidence that individuals who are at these particular kiosks step away for periods of time. It could well have been another person who takes these money orders. Is the prejudice mitigated by the fact that the evidence actually came in, too? That's something that can be considered, too, right? Because we're not talking about it didn't come in and then you discover it later, right? Short answer, no, because we could have taken additional steps prior to the late disclosure of the information. So if I distill your argument, the fact that you didn't know it before tied your hands in developing what we call the Saudi defense. Some other dude did it, right?  It basically had we known this information before. I apologize, Judge Graber. I'm sorry. I somewhat stepped on Judge Kavanaugh's question. I apologize for that. Did you ask for a recess or some other opportunity when this came out to investigate? We requested a mistrial, Your Honor, and the district court would have been within its discretion to continue to allow defense investigation. Did you ask for that specifically? Did you say we'd like a day to see what we can find out? We didn't specifically ask for it, Your Honor, but that request would have been subsumed in the mistrial request. At that point, anyhow, we're multiple years after the event. Had we had the information at the beginning of trial, we would have proceeded differently. Mindful of time, I'll just quickly touch on the handwriting point, and then I'd like to reserve the remainder of my time for rebuttal. The handwriting question, let me start by saying the government has never argued that Agent Williams' testimony didn't arise from this current litigation. And even if it did, its argument would be foreclosed by this court's decision in People v. Cepeda, which is also consistent with the Fifth Circuit's Pitts opinion, which we discussed at length. So haven't other courts, like the Eleventh Circuit, adopted— you've got the Eleventh Circuit in Hall, and didn't Agent Williams acquire her familiarity with McGee's handwriting differently than the officer in Cepeda? But I guess at the end of the day, even if you assume it was error, what does it really matter here? So this court's bound by Cepeda, and Cepeda is, again, consistent with Pitts. We acknowledge that the court identified in its focus letter the Eleventh Circuit seems to see things somewhat differently. We think that that's distinguishable for a couple of reasons, not least of which the investigator in Ariel had substantially more familiarity, much longer period of time of exposure to the defendant's handwriting samples. Why wasn't this harmless error, if it was error at all, in view of the other testimony and the fact that this seems to be kind of not the main piece of evidence in the case? So I think that the clearest reason it wasn't harmless error is because the government continuously hyped up how important this evidence was. So, for instance, it repeatedly argued how probative the $1 money orders were. That's 2 ER 147. But there's another witness, isn't there, who also testified about the handwriting? Wasn't there a second witness? There was also testimony from Sanders Castro, but her handwriting testimony is deficient because it lacks the requisite familiarity under, for instance, the Eleventh Circuit's Hall decision or the Seventh Circuit's Benzel, which is, again, consistent with Cepeda and Pitts. But the trial counsel didn't object to her testimony, correct, about the handwriting? We objected to the introduction of the $1 money orders more broadly, and we objected specifically to Agent Williams' testimony. But not Sanders Castro. Specifically said she could testify, in fact, right? That's correct, Your Honor, but we believe our broader objection to the introduction of the money orders would be sufficient to preserve the issue, but even under plain error review we would satisfy plain error as to Sanders Castro. But with respect to the Court's questions about Agent Williams, her testimony fails under Cepeda and Pitts. Seeing as I'm quite close to my time, I'll reserve the remaining time for rebuttal. All right. I'm going to give you 2 minutes because we had a lot of questions for you. Thank you. Thank you, Your Honor. Good morning. I think we have Ms. Hatley. Ms. Ahmed, Your Honor. Oh, that's the next one. So we have Nadia Ahmed? Yes, Your Honor. Okay. Good morning. Good morning. May it please the Court, Your Honors, Nadia Ahmed on behalf of the United States. Your Honors, just so the record is clear on the Montoya issue, Mr. McQuillan is correct that I had messaged him saying that we would concede remand for the limited purpose of the district court putting on the record the standard conditions, which she did not orally do other than through the reference to the PSR. That said, Your Honor, I did want to reference for the Court's purposes, since the question was asked, that in the sentencing guidelines, there is a specific reference to the standard conditions. It is in there, and that's at . . . Is the problem here that the standard conditions weren't obvious on the reference to the page? In the PSR, it says . . . Having been a trial judge, and if you say, okay, well, I'm imposing the standard conditions that are on page 10 without going through all of them, would that satisfy Montoya in your view? Your Honor, I think if it had been . . . There are 13 standard conditions that are explicitly stated in the sentencing guidelines. If the Court had said, I'm imposing all 13 . . . What section number is that? I'd like to go look at it. Yes, Your Honor, and I made a point of writing it down on one of my many pages here. It's section 5B1.3C. Thank you. At least I wrote that down. Your Honor, I would also note that in Montoya, they referenced 5D1.3C, so just in case I might be off. How is that different than what you . . . Didn't you say 5D1.3C? 5B1. I wrote it down on my notes, 5B1, but I see that in my copying of Montoya, they wrote 5D1. Okay, thank you. But, Your Honor, those 13 are listed, and they are stated as all 13 are recommended standard conditions. So on the one hand, you have the Sentencing Commission recommending all 13, but when the district court says, I'm imposing the standard conditions without clarifying necessarily which ones, I think then that's where it goes amiss of Montoya, which requires there to be clarity for the defendant's sake which conditions are being discussed and imposed. Well, I don't know if I agree with you, but I don't know if I'm going to fight a stipulation. I have other things to do with my time. Thank you, Your Honor. So moving away from that, I want to start then on the question of the Brady issue. So first, it's not, I think that the court is correct in focusing on the prejudice. There's no prejudice here. Really, at the end of the day, there's no prejudice to the defendant. The strong suggestion by defense counsel throughout the case was that Mr. McGee did not work there at the time that the driver's license had been copied, and just so the court has the See that the evidence was suppressed by the government. Your Honor, no, because I don't know that it was favorable evidence. And so to the extent that But that's a different prong, right? That's prong one. We're talking just prong two, suppression. Do you concede that one? So at the end of the day, Your Honor, just to clarify, there are three, there's allegations that there's three reports. The quick answer, Your Honor, is that what came out in the Slow down a little. Okay, slow down a little. What came out in the trial testimony of the visitor to the post office, Elsis, was that she recalled the person being a white male. And that was the first time, apparently, she said that in terms of the reports versus her testimony. How can that not be favorable? Mr. McGee is African American. Your Honor, it's not favorable. She said she dealt with a white clerk. Because, Your Honor, it's not relevant in the sense that we're talking about something that happened 10 months before Mr. McGee then has the victim's money orders and writes that driver's license number on the back. And so really, again, it's not favorable in the sense that it's really attenuating. And that seems like you're arguing the prejudice prong. Your Honor, at the end of the day We don't even know how the license, when the license number got there, right? We don't know. That's correct. What the government elicited from Elsis was that she had visited once that Valley Verde post office, and at that time her recollection was that a copy was made of her driver's license. At most, I think it helps the jury understand how it was possible that he may have obtained that license down the line, but it was never essential, really, to anybody that they understood perfectly well how he got that information to use on the driver's license. Because at the end of the day, the argument was put forth by the defense in their closing arguments that this was a white person who collected the driver's license, and the government failed to present any explanation as to how Mr. McGee may have come into that information. They didn't put any information into the record about whether or not it was preserved. They made the argument that the government put in a whole manual, an 800-page manual about the policies, but didn't present any evidence about this process. And so they presented that argument to the jury. So other than that, you think the evidence was unfavorable? What's your response to suppression? So, Your Honor, the testimony, I think because Agent Williams testified for the first time in the record, it appears on the stand that her understanding was that the person who obtained the driver's license was white. That information was in her hands, at least, and it was not conveyed to the defense. So is that suppression or not? Well, yes, Your Honor. It was information that was not given to the defense. Did the prosecutor know about it? Your Honor, the prosecutor's arguments and response, and so I did want to point out that there was not a... Okay, okay. Did the prosecutor know? No, Your Honor, no. Was it in any report that the prosecutor had? No, there's nothing in the record that the prosecutors knew. And looking at the prosecutor's response, so defendants come after the close of the case the next day and they make a motion for the indictment to be dismissed. As far as the record appears, it comes out when the witness testifies and when the officer testifies. Is it in any report anywhere? No. Your Honor, the defense said that there were three reports. There's only one that's in this record for this court's review. That report refers back. So the defense said that there was an August 1st interview, an August 6th interview, both of 2016, and then there's a 2021 interview. This is the proffer made by the defense in their motion to dismiss. So is it suppression of the information or is it suppression of an actual report where the information is contained? I understand the question, Your Honor. Thank you. So there's no indication that there was any report withheld from them, which is exactly what the prosecutor said to the district court. The information that they had they gave to the defense, and that was that at various points she was asked whatever she said, that's what they gave to the defense. And so there was never any indication from their records that this information had been documented. Okay, so Agent Williams interviews Ms. Elsus and writes a report of that interview, correct? No, Your Honor. She actually was not the author of the report. This is where it's a little bit different because Agent Williams was present for these interviews, but she was not the author of any of the reports. And so in the end, her recollection was that what they were told was that it was a white male, but what was documented by the other investigator indicated that when asked, first of all, it looks like from the report that is in the record, she wasn't even asked this question, Ms. Elsus, when they first talked to her because they thought that she had gone and cashed the money orders. And so their initial inquiry to her was, did you come to the post office and cash money orders? They weren't thinking that there was somebody who had gone and made a photocopy of her license that hadn't even come out yet. So that's that first report. In the August 4, 2016 report that they put in front of Agent Williams, in that report it indicates that Ms. Elsus, when asked about the identity of the post office worker who took her license, she didn't remember. Agent Williams testified at trial that her recollection was that Ms. Elsus said, at some point in their many conversations, that he was white. What we don't know is, there's no clear record of when that might have been because Agent Williams... And so the district court assumed that the defense had satisfied the first part, assumed without finding, and moved then to the prejudice argument. Is that correct? Yes, Your Honor. All right. Do you agree with me, and I think also your friend on the other side said, we can look at it de novo, and we could decide it's not relevant or it's not material or whatever, and we could decide it there, but we could also just look, we could assume without finding, and then go to the prejudice prong. Yes, and that's what we would ask this court to do is that, fine, the record is not necessarily fulsome on this issue in terms of what was put into the district court's record, but assuming without finding that there was expression on that person's identity, it's not prejudicial. And his argument of prejudice is, had they known it back then, they could have better developed a, put suspicion on a third party. Your Honor, again, we would... When we analyze prejudice, what do we look at? First, Your Honor, I would say that they were never foreclosed from doing that. There is actually no indication that they would have done anything different. They proffered that they would have done those things differently, but the district court correctly pointed out, well, you've actually been doing that the whole time pretty adeptly. You've been pointing out that maybe it could have been somebody else who accessed the, you know, Clerk 12 machine. All throughout the district court in discussing this issue said, you've done that. You've developed a third party defense all throughout the case. I've seen it. And so it's really unclear why, with respect to having the ability to do a third party defense, as to who actually cashed those $1,000 money orders.  So part of the argument that I understand is that what they weren't, the evidence did come in at trial from the witness and from the agent. Correct? Yes, Your Honor. So the jury heard that. That's correct, Your Honor. Did they argue that that was evidence that it could have been someone else? They did. Well, what they argued in closing was if the government doesn't present you with any evidence how Mr. McGee got that driver's license, since you know it was a white person who made the copy, that's the end of the road for you, jury, in terms of Mr. McGee's guilt. That's not exactly a word for word, but it's almost precisely what they argued. Are you the trial lawyer? No, Your Honor. Okay. Your Honor, before I, with respect to the handwriting issue. I think, do we have any other questions? I don't. No, thank you. Okay, go to the handwriting. Thank you, Your Honor. So I would just note, first of all, that People v. Cepeda is a very different case. In that case, it was clear that the person who was testifying had been given the information after the case had been indicted and for the purpose of getting on the stand, which is very different from what the court in Arial and all the other circuits that have looked at this have determined is the actual issue. And Calgary... Counsel, you did not raise this issue, am I right? Your Honor, it is correct that I did not, in the answering brief, discuss this because we pointed out that at the end of the day, there was no... No prejudice. No prejudice. Your Honor. And, Your Honor, we actually argued that this is a plain error issue because there was actually no objection during the testimony of the fiancé. And when the prosecutor asked about reviewing the handwriting, there was no objection at that time either. So the prosecutor elicited without any objection that Agent Williams looked at the record, or she looked at the employment records and compared that signature to McGee's signature and found that they were similar. She testified to that without objection. But in any event, there was no prejudice because the overwhelming evidence, regardless of the signature, indicated that it was Mr. McGee. And that included, as Your Honor... So the jury had all the signatures to look at, correct? That's correct, Your Honor. Portions, at least for sure, portions of the employment file with his signature were put into the record as exhibits at trial, and the jury had the ability to look at them. But specifically, counsel indicates that the $1 money orders were very significant for the government's case, but kind of bundles the handwriting into that. And that's not necessarily true because the evidence with respect to the $1 money orders was that they were both bought by Clerk 12 at Clerk 12's stand right after the victim in this case's money orders were bought, that they were actually one was signed into McGee's bank, the other one... The $1 is a little bit like when people get your credit card and they put a dollar, they run a dollar first to see if it goes through, and then they make the other purchase. Yes, Your Honor, and the testimony at trial by at least one witness was that you don't see $1 money orders, and in fact it's a red flag for employees because that's less than it costs to purchase the money order. And so for them, it's always... They're trained to look for that, essentially. That was Jasmine Webb that testified to that. And, Your Honor, at the end of the day, I would note also that counsel pointed to Pitts, which is a Fifth Circuit case, but after IRL was decided, the Fifth Circuit also joined in with the other circuits, and there was a decision issued by the Fifth Circuit on this as well that's consistent with them. And I, in the early morning hours of today, found that citation, and I'll give it to the court. It's United States v. Capistrano, 74F, 4th, 756, and it's Fifth Circuit, 2023. And so that's a Sixth Circuit. It's the Fifth Circuit, but it's a Sixth Circuit to have joined all these other circuits in saying that 901 and 701 don't require that the agent not have looked at this. An agent can testify as to their lay opinion if they learned about this information in the course of investigating a crime. That decision is consistent with all the other circuits that have reached that conclusion. This circuit has also said that agents can testify consistent with what they've discovered in an investigation under 901 and 701 as lay testimony, just not specifically as to handwriting. Well, it doesn't really come up that much in my experience. Usually, if the handwriting is a big deal, the government usually brings in a handwriting expert if that's the focus of the investigation. Your Honor, that's consistent with my experience as well, and I think that it's reflective of the fact that this was actually not a big deal in terms of an evidentiary point for the government. It was just one more thing in the grand scheme of rulings. Okay. Unless my colleagues have questions, you've gone a little over. Thank you, Your Honor. All right, thank you. I'll jump back in on the Brady issue. At bottom, what we're dealing with is another plausible suspect that was suppressed. Just to tie a knot on Judge Koh's question, this was suppressed information. There were three reports that didn't disclose this information. Agent Williams was there for at least a number of these interviews, knew the contrary white male identification, didn't disclose that. So it's been suppressed information. And it's pretty critical suppressed information because, really, the government failed to present evidence as to whether these licenses were photocopied or stored or whether the person who got the driver's license from Elsus was the only one who would have known that information. So that we didn't have that identification that excluded Mr. McGee, who is a black man. But in closing, Mr. McGee's counsel argued that he couldn't have taken Ms. Elsus' license and suggested that a white employee... I mean, he got to make the argument, right? Got to make a version of the argument, but one that was deprived of all of the buildup, all of the investigation that we could have done had we known the contrary identification. Well, maybe you could have established... I'm just looking at the video thing here that shows the transaction. Maybe you could have established that your client was involved in a conspiracy with some other white guy to sell... to steal money orders. But it's still pretty... This video, I mean, the best thing would be... may look like me, but not me. But it looks like your client in the video. Understood. But the basic prejudice that we get from the Brady violation is we could have explored these alternative third-party culpability defenses in substantially more detail after we get this information. But we get it too late to do anything with. So we need, at a minimum, mistrial. But given the misleading reports that we've been provided, we think dismissal would also be... Don't we ultimately decide if it would have made a different result in the trial, right? The prejudice analysis is a little bit different than a harmless error analysis, but it's effectively, were we deprived of some opportunity at trial? And we were. We were deprived of an opportunity to present an opening statement that highlighted these distinctions, et cetera. Seeing that I'm close to... Oh, I'm actually over time. You're over. Yep. Thank you, Your Honor. Call it. Thank you. All right, this matter will be submitted. Thank you both for your argument in this matter. The court's just going to take a very brief recess. We'll be in recess for 10 minutes, and then we'll come and hear the last case. Thank you.
judges: GRABER, CALLAHAN, KOH